John G. Balestriere
Jillian L. McNeil
**BALESTRIERE FARIELLO**
225 Broadway, Suite 2900
New York, NY 10007
Telephone:   (212) 374-5401
Facsimile:    (212) 208-2613
john.balestriere@balestriere.net
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **THE HEMMERDINGER CORPORATION, d/b/a ATCO**,<br><br>          Plaintiff,<br><br>    - against -<br><br>**FRANK M. RUOCCO, JR., BORIS A. TOMICIC, WILLIAM S. McCAMBRIDGE, EARTH TECHNOLOGY, INC., and RECYCLE TECHNOLOGY, LLC,**<br><br>          Defendants. | Index No.:<br><br>**COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff The Hemmerdinger Corporation d/b/a ATCO ("Plaintiff" or "ATCO"), for its Complaint against Defendants Frank M. Ruocco, Jr. ("Ruocco"), Boris A. Tomicic ("Tomicic"), William S. McCambridge ("McCambridge"), Earth Technology, Inc. ("ETI"), and Recycle Technology, LLC ("RecTec" collectively, "Defendants" or "the Enterprise") respectfully alleges as follows upon information and belief, except as to allegations concerning Plaintiff, which are made upon personal knowledge, and except as otherwise indicated herein:

## PRELIMINARY STATEMENT

1.     ATCO is a real estate development firm that was defrauded out of many hundreds of thousands of dollars by Defendants who worked together to inflate bills and submit those bills to ATCO for work involved in ATCO's development and construction of a shopping mall in Glendale, Queens, New York.

2.     ATCO is a multi-dimensional real estate company that has operated its family-owned New York business for four generations beginning in Queens in 1922.  In mid-2004, ATCO employed general contractor Plaza Construction Corporation ("Plaza") to begin building a shopping center ("Atlas Park") in Glendale, Queens.

3.     Consistent with industry practice, many sub-contractors were used to perform various tasks as part of the years-long development project beginning in mid-2004.  Plaza sub-contracted the soil excavation and soil remediation work ("the ETI Project") at Atlas Park to Frank Ruocco's company ETI—a site development and environmental services company based in North Haven, Connecticut.  ETI's project manager Boris Tomicic was in charge of overseeing the ETI Project at Atlas Park.

4.      Consistent with industry standard, ETI's sub-contract with Plaza entitled ETI to the "direct cost" of its soil excavation and soil remediation work plus 15% in additional financial compensation.  This 15% compensation was allotted to ETI to cover overhead, supervision, small tools, and profit ("the 15% Markup").

5.      But members of the Enterprise conspired to work together to drastically inflate the bills submitted by the Enterprise to Plaintiff ATCO.  Ruocco and Tomicic conspired with William McCambridge and McCambridge's company RecTec—a contaminated fuel disposal, soil disposal, and recycling company based in Charlton, Massachusetts—to damage ATCO by hundreds of thousands of dollars.

6.      Specifically, Ruocco and Tomicic engaged in a conspiracy to inflate ("the Enterprise Inflations") certain invoices related to the ETI Project ("the Fraudulent Invoices") by routing direct cost invoices—invoices for the actual costs of the services provided—through RecTec, a company managed by McCambridge, secretly funded by Ruocco, and which provided absolutely nothing of value to ATCO.  Ruocco and Tomicic never disclosed their interest in RecTec to ATCO.  The Enterprise never admitted to ATCO their conspiracy to inflate portions of ETI's bills submitted to ATCO nor the resulting inflations of portions of ETI's bills submitted to ATCO.  The inflations resulted from an increased price that was far higher than the direct cost of certain portions of the ETI Project.

7.      McCambridge served as manager of RecTec.  McCambridge was aware that the sole reason for the inclusion of his company, RecTec, in the ETI Project at Atlas Park was to provide a company through which direct cost invoices could be routed in

support of the Enterprise Inflations.  These inflations increased the direct costs of the ETI Project and generated hundreds of thousands of dollars in additional profits for the Enterprise.

8.     Clean Earth of New Jersey ("Clean Earth") provided the ETI Project with at least twelve transportation and disposal services ("the Twelve Fraudulent Services") related to the ETI Project at Atlas Park.  These Twelve Fraudulent Services generated direct cost invoices regarding the Atlas Park project that Ruocco and Tomicic had routed through RecTec.  At RecTec, McCambridge inflated the direct costs of the services provided by Clean Earth.  These Enterprise Inflations stemming from the Twelve Fraudulent Services resulted in the Fraudulent Invoices.

9.     ATCO had end responsibility to pay these invoices, and did so.  From 2004 to 2005, ATCO overpaid by an amount of at least $405,068.04.

10.     The Enterprise Inflations and the resulting Fraudulent Invoices went unnoticed for years for several reasons.  First, Tomicic submitted misleading budget prices to ATCO for the estimated direct costs on at least the Twelve Fraudulent Services.  These misleading estimations by the Enterprise anchored ATCO to expect a higher end price thus priming them to be susceptible in not noticing the fraudulent invoices.

11.     Second, ATCO was aware that disposing of possible hazardous and contaminated soil and materials could significantly increase the costs of the ETI Project.  ATCO was ready to trust ETI's misleading budget overestimations.

12.     Third, in order to substantiate the intentionally misleading direct cost estimations, members of the Enterprise, including at least Tomicic, committed outright criminal forgery: they created fraudulent back-up documentation to support the overestimated direct costs.   These included completely bogus "competitive" bids submitted to ATCO that made it seem as if RecTec had actually offered the lowest cost services.

13.     Finally, the Enterprise, in realizing ATCO was overseeing a roughly $200 million development project, took advantage of the bustling atmosphere to increase their own profits through the self-dealing Fraudulent Invoices.

14.     The Enterprise damaged ATCO in at least three ways.   First, the Enterprise inflated at least the invoices for the direct costs of the Twelve Fraudulent Services to prices which were far higher than the actual direct costs of the services provided.  This resulted in an overpayment of at least $291,101.72.

15.     Second, ETI's sub-contracted 15% Markup was subsequently increased due to the Enterprise Inflations on the direct cost invoices.  This resulted in additional overpayment of at least $43,665.26.

16.     Third, Plaza—which may not have actually been a part of the Enterprise— charged ATCO more than it should have due to the Enterprise's fraud.  Specifically, Plaza was permitted by contract to charge 21% on the direct cost of the sub-contractors, such as ETI, for Plaza's allotted profit as general contractor ("the 21% Markup").  This also was increased by the Enterprise Inflations on the Fraudulent Invoices, resulting in additional overpayment damages to ATCO of $70,301.06.

17. ATCO was unaware of these fraudulent charges. Then, on June 4, 2008, Environmental Protection Agency (EPA) Investigator Thomas Rudman ("Rudman") first had a phone conversation with ATCO's environmental lawyer Linda Shaw ("Shaw"), asking questions about what would later be revealed to be the Enterprise. ATCO did not fully comprehend Defendants' fraud until August 17, 2009 when it had compiled enough data to generate a Victim Impact Statement related to the criminal matter brought by the United States Attorney in the District of Connecticut against McCambridge.

18. McCambridge pleaded guilty to a one-count Information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, on July 7, 2009. *See* McCambridge Plea Agreement, dated July 7, 2009, attached as Exhibit 1. On July 7, 2009, McCambridge admitted that he "willfully and corruptly conspired to execute and attempt to execute a scheme and artifice to defraud a property developer [ATCO] out of money and property by means of interstate wire communications." Id at 1. "The charge stems from McCambridge's participation in a scheme to defraud the developer of a New York shopping mall by submitting inflated invoices for the removal of contaminated soil." *See* Press Release titled "Massachusetts Man Admits Role in Fraud Scheme," dated July 7, 2009, attached as Exhibit 2.

19. Tomicic resisted any attempt by the Government to force him to accept responsibility for his crime and fraud. Tomicic was indicted on September 16, 2009, for his role in the scheme relating to the Fraudulent Invoices submitted to ATCO. *See* Grand Jury Indictment, dated September 16, 2009, attached as Exhibit 3. At trial,

Tomicic was convicted of the felony of wire fraud (*See* Press Release titled "Controversial State Contractor Frank Ruocco Not Guilty in Federal Fraud Trial," dated November 4, 2011, attached as Exhibit 4) for his September 8, 2005 facsimile of bogus competitive bids.  *See* attached Exhibit 3 at 13.  Tomicic currently awaits sentencing scheduled for June 2012.

20.    Ruocco and ETI were also indicted with Tomicic for their participation in the scheme involving the Fraudulent Invoices.  *See* attached Exhibit 3.  However, at trial, Ruocco and ETI were not convicted of the charges against them because, under the "beyond a reasonable doubt" standard employed in criminal matters, it may not have been sufficiently clear to the jury that Ruocco aided—and almost certainly directed—his employee, Tomicic, in committing wire fraud.  However, it is readily apparent that Ruocco and ETI directed and managed the fraudulent actions taken by the Enterprise to defraud property developer ATCO out of hundreds of thousands of dollars by submitting the Fraudulent Invoices.

21.    Previous allegations of nearly this exact conduct by Ruocco in other contexts with other victims demonstrates the necessity of the use of the remedial consequences for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  *See* 18 U.S.C. § 1962(c) and 1962(d).  Indeed, another Ruocco-owned company, Earth Technology II ("ETI II"), pleaded guilty to mail fraud for inflating direct cost invoices submitted to customers at an environmental remediation site in Connecticut.  *See* ETI II Plea Agreement, dated November 22, 2006, attached as Exhibit 5.  ETI II paid a $500,000.00 fine.  However, Ruocco sold his interest in the company

before ETI II's plea agreement.  *See* Press Release titled "Conspiracy Case Ends in Acquittals," dated November 14, 2011, attached as Exhibit 6.  Moreover, ETI was alleged to have fraudulently inflated direct cost invoices on a Connecticut Department of Transportation project site.  *See* Press Release titled "DOT Overrode Blumenthal, Kept Firm on Hire List," dated August 30, 2010, attached as Exhibit 7.

22.   ATCO did not obtain restitution from the criminal prosecution, and, thus, looks to civil court for justice for its victimization by the Enterprise.  The Enterprise's Fraudulent Invoices have injured ATCO by at least $405,068.04 (close to $600,000.00 with pre-judgment interest as calculated at the time of filing) in increased costs of the excavation and remediation work for the Atlas Park project.  Moreover, ATCO has had to hire several attorneys, consultants, and other professionals to deal with the mess which the Enterprise created.  The Enterprise's racketeering efforts have boosted the profits of Ruocco, Tomicic, McCambridge, ETI, and RecTec while injuring site developer ATCO.

23.   ATCO seeks treble damages, attorneys' fees, and any other relief the Court deems proper.

## JURISDICTION AND VENUE

24.   This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(a), which allows the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1962.

25.   This Court, additionally, has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as ETI, Tomicic, and Ruocco reside in Connecticut, RecTec and McCambridge

reside or resided in Massachusetts, ATCO resides and operates in New York, and the matter in controversy exceeds $75,000.00.

26.     This Court has personal jurisdiction over the parties, as the actions which constitute the violations of 18 U.S.C. § 1962(c) and (d) were conducted in relation to the construction of Atlas Park, a shopping center at 8000 Cooper Avenue, Glendale, New York 11385 in Queens, New York in this District.   ATCO, who provided all start-up equity for the Atlas Park construction, has its Glendale offices at 70-34 83rd Street, Glendale, NY 11385.  Moreover, nationwide service of process is conferred by 18 U.S.C. § 1965(b) for violations of 18 U.S.C. § 1962 as long as the Court has personal jurisdiction over at least one party.

## PARTIES

### Plaintiff

27.     The Hemmerdinger Corporation d/b/a ATCO is a family of companies that develops real estate, manages assets, and provides other resources for the real estate industry.   ATCO has been incorporated in New York since 1922, and is headquartered at 555 Fifth Avenue, 16th Floor, New York, NY 10017.  ATCO's Queens office is located at 70-34 83rd Street, Glendale, NY 11385.  ATCO provided all equity for Atlas Park and oversaw the Atlas Park project from its Glendale office.   ATCO contracted general contractor responsibilities for site construction to Plaza.  ATCO is a person under 18 U.S.C. § 1961(3).[1]

---

[1] 18 U.S.C. § 1961(3): "'[P]erson' includes any individual or entity capable of holding a legal or beneficial interest in property … "

**Defendants**

28.     Frank M. Ruocco, Jr. is an individual who is president and owner of ETI. Ruocco is believed to reside in Cheshire, Connecticut.  Ruocco is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Ruocco is alleged to have committed an action, that action was committed both in his individual capacity, and on behalf of ETI.

29.     Boris A. Tomicic was an ETI employee who was project manager of the ETI Project at Atlas Park.  Tomicic is believed to reside in West Hartford, Connecticut. Tomicic was indicted on September 16, 2009, and later convicted of the felony of wire fraud.  Tomicic is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that Tomicic is alleged to have committed an action, that action was committed both in his individual capacity, on behalf of ETI, and at the behest of ETI president and owner Ruocco.

30.     William S. McCambridge is an individual who was manager of RecTec. McCambridge is believed to reside in Dudley, Massachusetts.  McCambridge pleaded guilty to a one-count Information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, on July 7, 2009.  McCambridge is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that McCambridge is alleged to have committed an action, that action was committed both in his individual capacity, and on behalf of RecTec.

31.     Earth Technology, Inc., is located at 250 Sackett Point Road, North Haven, Connecticut 06473.  Plaza sub-contracted to ETI the excavation and remediation work at

Atlas Park.  ETI is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that ETI is alleged to have committed an action, that action was committed both in its capacity as a corporation, and at the behest of and direction from Ruocco and Tomicic.

32.     Recycle Technology, LLC, was located at 17 Griffin Road, Charlton, Massachusetts 01507.  RecTec added the Enterprise Inflations to the Fraudulent Invoices without providing any additional services to the Atlas Park project.  RecTec is a person under 18 U.S.C. § 1961(3).  Unless otherwise specified, every time that RecTec is alleged to have committed an action, that action was committed both in its capacity as a corporation, and at the behest of and direction from McCambridge.

### Other Relevant Persons and Entities

33.     Clean Earth is a company that disposes of contaminated soil, hazardous wastes, dredge sediments, and other environmentally hazardous soils.  Clean Earth provided ETI with transportation and disposal services for certain portions of the ETI Project at the Atlas Park site.  Clean Earth's transportation and disposal services constituted the direct costs of the Twelve Fraudulent Services.  ETI was entitled to reimbursement from ATCO for the Clean Earth direct costs plus the 15% Markup.

34.     Damon Hemmerdinger is senior vice president of ATCO Properties & Management.  Damon Hemmerdinger was ETI's and Plaza's point of contact in ATCO.

35.     Linda Shaw is ATCO's environmental lawyer.  Shaw provided ATCO with analysis of environmental laws and regulations throughout the creation of Atlas Park.

36. Mark Powers ("Powers") is an ATCO employee. Powers supervised the design and construction of Atlas Park.

37. Plaza Construction Corporation is a construction company. ATCO contracted general contractor responsibilities to Plaza for Atlas Park. As general contractor, Plaza approved of all ETI invoices. At this time, it is not alleged that Plaza was aware of the Enterprise's self-dealing Fraudulent Invoices, though it is clear that Plaza wrongly profited from the Enterprise's misconduct.

38. SRS Transportation Company, LLC ("SRS") was a company owned by Frank Ruocco. After providing start-up funds to RecTec, SRS was dissolved in 2004.

39. Thomas Rudman is an EPA Investigator. Rudman first contacted ATCO in June 2008 with significant interest in ETI's invoices submitted to ATCO for the Atlas Park project.

### Entities Flowchart

40. Arrows illustrate the direction of invoices as they flow from the original direct cost invoices from Clean Earth to, ultimately, Plaintiff property developer ATCO.



## STATEMENT OF FACTS

### The Creation of the Enterprise

41.     On May 5, 2004, RecTec was incorporated as a limited liability corporation in Massachusetts with McCambridge as its manager.  *See* RecTec Certificate of Organization, dated May 5, 2004, attached as Exhibit 8.

42.     Between May 26, 2004, and December 1, 2004, RecTec received six wire transfers from SRS, another of Ruocco's companies, amounting to $425,000.00.  *See* SRS Wire Transfers to RecTec, dated May 26, 2004 to December 1, 2004, attached as Exhibit 9.  Ruocco was the managing member of SRS.  *See* SRS Articles of Dissolution, dated December 31, 2004, attached as Exhibit 10.  SRS was dissolved on December 31, 2004, a month after the final wire transfer of start-up funds to RecTec.  Id.

43.     On November 24, 2004, a month before ETI submitted the first invoice that included the Enterprise Inflations, Ruocco, Tomicic, and McCambridge all signed RecTec's private operation and equity agreement.  Ruocco was allotted 70% of RecTec's equity and profits, Tomicic 20%, and McCambridge 10%.  *See* RecTec Operation and Equity Agreement, dated November 24, 2004, attached as Exhibit 11.

44.     That same day, November 24, 2004, McCambridge also signed a promissory note on behalf of himself and RecTec for $721,105.50 to The Abrams Trust. *See* RecTec Promissory Note, dated November 24, 2004, attached as Exhibit 12.  The Abrams Trust was established by Ruocco with Ruocco's children as the beneficiaries. *See* Stipulation regarding The Abrams Trust, attached as Exhibit 13.

### ATCO and ETI Initial Relationship

45.     On September 2, 2004, Plaza sub-contracted excavation and remediation work at Atlas Park to ETI.  *See* Plaza Sub-Contract with ETI, dated September 2, 2004, attached as Exhibit 14.

46.     The discovery of hazardous soil, contaminated soil, and used tanks and drums ("the Polluted Materials") at the Atlas Park site necessitated specialized disposal due to environmental concerns.  ATCO employees were aware that disposal of the Polluted Materials could significantly increase the costs of the excavation and remediation work at the Atlas Park site.

47.     Ruocco and Tomicic, through ETI, took advantage of ATCO's expectations of significantly increased excavation and remediation costs regarding the Polluted Materials, and conspired with RecTec to inflate certain invoices related to the ETI Project.  In a $200 million development project, the Enterprise Inflations went unnoticed by ATCO while the Enterprise enjoyed hundreds of thousands of dollars in fraudulently acquired profits due to their invoice inflation scheme.

### The Enterprise Defrauds Atlas Park by Submitting the Fraudulent Invoices

48.     With all the companies in place and agreements ratified for the Enterprise's soil remediation services and site redevelopment services, all Defendants conspired and acted on their conspiracy to damage ATCO by at least $405,068.04 (close to $600,000.00 with pre-judgment interest as calculated at the time of filing).  These damages arise from at least the Twelve Fraudulent Services regarding the Polluted Materials for which ETI funneled the direct cost invoices through RecTec.  *See* Price List

regarding RecTec Direct Cost Inflations on the Twelve Fraudulent Services, attached as Exhibit 15.

49.     The Enterprise provided ATCO with misleading budget overestimations regarding the direct costs for at least the Twelve Fraudulent Services.  The Enterprise then fraudulently created back-up documentation to support the budget overestimations supplied to ATCO.  Thus, the Enterprise was able to inflate the direct cost invoices to match the overestimated budget of direct cost prices submitted to ATCO.  The fraudulent back-up documentation substantiating the inflations on the direct cost invoices aided the Enterprise's fraud in remaining unnoticed by Plaintiff.

50.     The Enterprise also provided ATCO with fraudulently created competitive bids.  It is construction industry norm to receive multiple bids for services from providers and then, typically, to select the provider with the lowest cost proposal. On at least one of the Twelve Fraudulent Services—the service which created a majority of ATCO's damages, the transport, disposal, and treatment of D006 bulk soil—the Enterprise submitted bogus competitive bids to ATCO to make it appear that RecTec provided the service, for the lowest cost, when, in fact, Clean Earth provided the transportation and disposal services for a significantly decreased direct cost.  *See* Bogus Competitive Bids, dated September 8, 2005, attached as Exhibit 16.

51.     The Twelve Fraudulent Services and their combined damages to ATCO are detailed in the table below, with each column term defined as follows:

- **Service Description**: Description of the Twelve Fraudulent Services provided by Clean Earth for which ATCO was damaged by the Enterprise Inflations on the direct cost invoices.

- **Direct Cost**: The direct costs, as billed by Clean Earth, of the Twelve Fraudulent Services. ETI's sub-contract entailed their financial compensation for the ETI Project as the direct costs of the services provided with the addition of the 15% Markup.

- **RecTec Inflation**: The monetary inflations RecTec included on the direct costs for each of the Twelve Fraudulent Services. RecTec included these direct cost invoice inflations while providing no additional services.

- **15% Markup Damages**: The damages to ATCO created by the increase in ETI's 15% Markup due to the invoice inflations on the direct costs of the Twelve Fraudulent Services. Totaled by finding 15% of the RecTec Inflation.

- **21% Markup Damages**: The damages to ATCO created by the increase in Plaza's 21% Markup due to the invoice inflations on the direct costs of the Twelve Fraudulent Services. Totaled by finding 21% of the summation of the RecTec Inflation and the 15% Markup Damages.

- **Total Billed:** The total billed to ATCO on the Twelve Fraudulent Services. Totaled by finding what would have been charged to ATCO had the invoices for the Twelve Fraudulent Services not been inflated ((Direct cost multiplied by 15% allotted to ETI) multiplied by 21% allotted to Plaza) added to the Total Damages.

- **Total Damages**: The total monetary damages to ATCO for each of the Twelve Fraudulent Services. Totaled by adding the RecTec Inflation, the 15% Markup Damages, and the 21% Markup Damages.

| **Service Description** | **Direct Cost** | **RecTec Inflation** | **15% Markup Damages** | **21% Markup Damages** | **Total Billed** | **Total Damages** |
|---|---|---|---|---|---|---|
| Transport, Disposal, and Treatment D006 Bulk Soil | $379,701.38 | $269,513.52 | $40,427.03 | $65,087.52 | $903,382.54 | $375,028.06 |
| Transport, Disposal, and Treatment Non-Hazardous Petroleum Soil | $64,248.53 | $10,078.20 | $1,511.73 | $2,433.89 | $103,425.65 | $14,023.82 |
| Rental – 2 Roll-Offs – 40 Days | $1,000.00 | $400.00 | $60.00 | $96.60 | $1,948.10 | $556.60 |
| Rental – 4 Roll-Offs – 36 Days | $1,800.00 | $720.00 | $108.00 | $173.88 | $3,506.58 | $1,001.88 |
| Mobilization and Demobilization – 8 Roll-Offs | $5,400.00 | $2,160.00 | $324.00 | $521.64 | $10,519.74 | $3,005.64 |
| Processing Fee for Oversized Tank Disposal | $300.00 | $120.00 | $18.00 | $28.98 | $584.43 | $166.98 |
| Transport, Disposal, and Treatment Non-Hazardous Petroleum Soil | $22,312.50 | $3,500.00 | $525.00 | $845.25 | $35,918.09 | $4,870.25 |
| Drum Disposal | $1,200.00 | $480.00 | $72.00 | $115.92 | $2,337.72 | $667.92 |
| Transport, Disposal, and Treatment Non-Hazardous Lead | $6,375.00 | $1,000.00 | $150.00 | $241.50 | $10,262.31 | $1,391.50 |
| Transport, Disposal, and Treatment D006 Bulk Debris | $2,550.00 | $1,810.00 | $271.50 | $437.12 | $6,066.95 | $2,518.62 |
| Rental – 2 Roll-Offs – 60 Days | $1,500.00 | $600.00 | $90.00 | $144.90 | $2,922.15 | $834.90 |
| Mobilization and Demobilization – 8 Roll-Offs | $1,800.00 | $720.00 | $108.00 | $173.88 | $3,506.58 | $1,001.88 |
| **Totals** | $488,187.41 | $291,101.72 | $43,665.26 | $70,301.06 | $1,084,380.82 | $405,068.04 |

52.     The Enterprise Inflations provided at least $291,101.72 in additional profits to the Enterprise on the Twelve Fraudulent Services provided to ATCO.  These additional profits were split among the conspirators according to the RecTec operation and equity agreement—70% to Ruocco, 20% to Tomicic, and 10% to McCambridge.  *See* attached Exhibit 11.

53.     ETI, solely due to the Enterprise Inflations, profited further because ETI's 15% Markup was fraudulently increased by at least $43,665.26 after the Enterprise Inflations were added to the direct cost invoices.

54.     Lastly, the Enterprise further damaged ATCO as Plaza's 21% Markup increased by $70,301.06 due to the Enterprise Inflations on the Fraudulent Invoices.  As a result, the Enterprise's scheme to defraud damaged ATCO by at least $405,068.04 (close to $600,000.00 with pre-judgment interest as calculated at the time of filing).



55.     ETI received $73,228.11 as its legitimate 15% Markup on the direct costs of the at least Twelve Fraudulent Services for which ATCO was billed.  However, the Enterprise conspired together to increase their end-of-the-day profits by over 457%.

<u>**ATCO First Learns of the Fraud**</u>

56.     During the ETI Project, ATCO was never aware of the Enterprise's self-dealing Fraudulent Invoices, which included the Enterprise Inflations.  The Enterprise's fraud remained unnoticed by ATCO because the Enterprise hid the falsity of the Fraudulent Invoices by supporting them with bogus back-up documents and providing

ATCO with misleading overestimations regarding the direct costs for at least the Twelve Fraudulent Services.   Furthermore, ATCO's readiness to expend extended financial resources to keep the development project on schedule, even with findings of the Polluted Materials, created a situation where the Enterprise was able to take advantage of ATCO.  This fraud went unnoticed by ATCO until, at the absolute earliest, June 4, 2008.

57.    On that day, EPA Investigator Rudman contacted ATCO to discuss ETI's invoices on the Atlas Park project.  *See* Letter from ATCO Environmental Lawyer regarding Notice of Claim, dated June 5, 2008, attached as Exhibit 17.

58.    Sometime between the initial contact in June 2008 and the creation of a Victim Impact Statement on August 17, 2009, ATCO learned of the fraud the Enterprise committed against it.

### Specific Allegations of Fraud Against the Defendants

#### A.  Who Made the Fraudulent Statements or Omitted to Speak?

59.    Ruocco, Tomicic, and McCambridge made fraudulent statements and omitted to speak.

#### B.  What are the Fraudulent Statements or Omissions?

60.    Inflated Invoices**:** Ruocco, Tomicic, and McCambridge conspired to submit and submitted the fraudulent invoices to at least Plaintiff ATCO.   These fraudulent invoices included inflations of the direct costs of portions of the ETI Project.

61.    Fraudulent Documents: Ruocco and Tomicic used ETI and McCambridge used RecTec to create back-up budgeting documentation to legitimize the inflations on

Plaintiff ATCO's Atlas Park project. Tomicic has already been found guilty of the fraudulent creation of back-up documentation—the bogus competitive bids supplied to ATCO.

62. <u>Financial Relationships of the Enterprise</u>: Ruocco, Tomicic, and McCambridge omitted to notify Plaintiff ATCO of the financial and equity relationships between themselves. ATCO was not aware of Ruocco's and Tomicic's use of ETI to self-deal by routing direct cost invoices through RecTec and manager McCambridge in order to inflate the direct costs of certain services provided to ATCO.

<u>C. When and Where Did the Speakers Make the Fraudulent Statements or Omit to Speak?</u>

63. Ruocco, Tomicic, and McCambridge omitted to speak and made fraudulent statements while conducting business via email, mail, and facsimile in at least Charlton, Massachusetts, North Haven, Connecticut, Glendale, New York, and South Kearny, New Jersey, and while conducting business on the Atlas Park project site in Glendale, New York.

64. Ruocco, Tomicic, and McCambridge omitted to speak and made fraudulent statements throughout at least the consummation of the sub-contract for the excavation and remediation work at Atlas Park, throughout at least the excavation and remediation work at Atlas Park, throughout at least the conspiracy to inflate the direct costs of certain portions of the excavation and remediation work at Atlas Park, and throughout at least the payments for the excavation and remediation work at Atlas Park—a period from at least September 2, 2004—the date of the ETI sub-contract with

Plaza—through at least March 20, 2007—the date of a payment from ETI to RecTec.  *See* Predicate Acts Table, attached as Exhibit 18.

D.  To Whom Did the Speakers Make the False Statements or Omit to Speak?

65.      Ruocco, Tomicic, and McCambridge omitted to speak to at least employees, owners, and other professionals working for property developer ATCO, including, but not limited to, Damon Hemmerdinger, Linda Shaw, and Mark Powers, regarding the Defendants' financial interconnections and decisions to inflate invoices for the direct costs of certain services provided to victim ATCO.

66.      Tomicic submitted fraudulently created competitive bids, inflated invoices, and budget overestimations to ATCO employees, including, but not limited to, Damon Hemmerdinger, Linda Shaw, and Mark Powers, regarding the direct costs of at least the Twelve Fraudulent Services provided to ATCO.

E.  Why Were the Statements or Omissions False or Misleading?

67.      Although Ruocco, Tomicic, and ETI asserted the invoices they submitted to ATCO reflected the direct costs of the services provided by ETI, the invoices actually included major inflations after being routed through RecTec and manger McCambridge.  The inflations were also false as they were not based on the provision of any service or value of any kind.

68.      It was misleading for Ruocco, Tomicic, and ETI to engage McCambridge and RecTec—a company in which both Ruocco and Tomicic held equity and shared profits—to increase the direct costs of certain portions of at least the services provided to Plaintiff ATCO because McCambridge and RecTec provided nothing of value.

69.     The bids and overestimations regarding the direct costs of certain services submitted by Tomicic were false.  The so-called "competitive bids" were fabricated by Tomicic and the budget estimations were inflated despite no increase in direct costs.

70.     These material misrepresentations and omissions led ATCO to pay invoices where McCambridge and RecTec had inflated the invoice price without providing any additional services to ATCO.

F.  Why Was It Reasonable for ATCO to Believe the False Statements or Not to Question the Omissions?

71.     The Defendants took advantage of ATCO's willingness to expend increased resources to dispose of contaminated soils and materials in an environmentally sustainable fashion. The Enterprise, in realizing ATCO was overseeing a roughly $200 million development project, took advantage of the bustling atmosphere to increase their own profits through their self-dealing invoice inflations.

72.     ATCO reasonably believed that the excavation and remediation work regarding certain services provided to ATCO could significantly increase the costs of the project, and thus, believed ETI's false budget estimations.  It was reasonable that ATCO believed that the bogus competitive bids created by Tomicic were actual competitive bids submitted to ETI.

73.     The Defendants created inflated invoices, backed by fraudulently created documentation, to increase the Defendants' profits by billing ATCO at an inflated direct cost.  Due to the fraudulently created back-up documentation, of which Tomicic has already been found guilty in criminal court, it was reasonable that ATCO relied on

Defendants' fraudulent misrepresentations.

G.  The Common Course of Conduct of Fraud and Reliance Upon It

74.     Ruocco, Tomicic, and McCambridge repeatedly misled at least ATCO to believe that the invoice inflations from McCambridge and RecTec regarding the direct costs of certain portions of the services provided were legitimate business expenses, and that it was not, in fact, a fraudulent sham that the Defendants created in order to generate more profit for Ruocco, Tomicic, McCambridge, ETI, and RecTec.  The Defendants worked together for this purpose and ATCO justifiably relied on the Defendants' representations that the inflations from McCambridge and RecTec were legitimate business expenses and that the bogus competitive bids from Tomicic were legitimate bids whereby Ruocco, Tomicic, and ETI had decided that McCambridge and RecTec offered the lowest cost services for transportation and disposal of certain portions of the ETI Project.

**FIRST CAUSE OF ACTION**
**(Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c))**

75.     Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

76.     All Defendants have acted in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) to the detriment of the Plaintiff.

77.     At all times relevant to these allegations, ATCO and all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

78.     At all times relevant to the above allegations, all Defendants had an ongoing business relationship whereby they provided soil remediation services and site redevelopment services for their customers.  However, invoices for the direct cost of the disposal of certain Polluted Materials from the Atlas Park site were funneled through RecTec solely for the purpose of presenting fraudulent invoices regarding direct cost services.  The ETI Project provided for ETI's compensation for the excavation and soil remediation work at the Atlas Park site at direct cost plus 15% Markup.  However, the Enterprise's scheme was able to convert the 15% Markup into a fraudulent 457% markup resulting in drastically increased profits for Ruocco, Tomicic, McCambridge, ETI, and RecTec.   The Enterprise Inflations damaged Plaintiff ATCO by at least $405,068.04 (close to $600,000.00 with pre-judgment interest as calculated at the time of filing).

79.     This business relationship whereby Ruocco provided start-up funds for RecTec, Tomicic and Ruocco through ETI and McCambridge through RecTec conspired to inflate and inflated direct cost invoices for certain portions of the ETI Project, and where Ruocco, Tomicic, and McCambridge shared in the resulting profits constitutes an "association in fact" enterprise within the meaning of 18 U.S.C. § 1961(4) that was engaged in, or the activities of which affected, interstate or foreign commerce.

80.     In their intentional scheme to defraud ATCO, Defendants engaged in activities which constitute "racketeering activity," including wire fraud and mail fraud, within the meaning of 18 U.S.C. § 1961(1).  *See* attached Exhibit 18.

81.     The inflated direct cost invoices regarding the Twelve Fraudulent Services delivered from RecTec in Massachusetts to ETI in Connecticut and onto Plaza and eventually ATCO in New York resulted in multiple predicate acts and a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

## SECOND CAUSE OF ACTION

### (Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d))

82.     Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

83.     All Defendants have acted in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) to the detriment of the Plaintiff.

84.     At all times relevant to these allegations, ATCO and all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

85.     Ruocco, Tomicic, and McCambridge conspired to use their companies, ETI and RecTec, to create a scheme to defraud ATCO.  All Defendants conspired to violate Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) by associating in fact to create an Enterprise which then engaged in a pattern of racketeering activity to defraud and damage ATCO with at least predicate acts of mail fraud and wire fraud. *See* attached Exhibit 18.

86.     The period of the conspiracy to defraud ATCO may have begun as early as May 26, 2004, when Ruocco, through his company SRS, began providing RecTec with start-up funds.  *See* attached Exhibit 9.  On November 24, 2004, Ruocco, Tomicic, and McCambridge executed RecTec's operation and equity agreement which divided the equity and profits of RecTec among them.  *See* attached Exhibit 11.

87.     By December 28, 2004, the conspiratorial plans were in motion, as Clean Earth, at the behest of Tomicic and ETI, provided McCambridge and RecTec with proposed transportation and disposal costs for portions of the Twelve Fraudulent Services.  *See* attached Exhibit 18.  The Enterprise's conspiracy lasted until at least March 20, 2007, the date of one of the last known payments from ETI to RecTec.  *See* attached Exhibit 18.  But, the conspiracy may have lasted far longer, until RecTec's dissolution on April 30, 2009.

88.     The object of the conspiracy was defrauding at least ATCO by inflating the direct costs of at least the Twelve Fraudulent Services provided by Clean Earth. These inflations damaged ATCO as ATCO paid for both the inflations on direct costs and the subsequent increases in ETI's allotted 15% Markup and Plaza's allotted 21% Markup.

89.     Each predicate act committed by the Enterprise was in furtherance of the conspiracy.  *See* attached Exhibit 18.  Specifically, Tomicic furthered the conspiracy by instructing Clean Earth to send certain transportation and disposal proposals to McCambridge and RecTec in order for invoices to be funneled through RecTec.  On January 7, 2005, the conspiracy was furthered when a spreadsheet was faxed from ETI to McCambridge and RecTec with the inflated prices for the direct cost invoices before submitting them to Ruocco, Tomicic, and ETI.

90.     Ruocco, Tomicic, and McCambridge instructed Ruocco's attorney, Steven P. Ciardiello, the attorney in charge of generating RecTec's operation and equity agreement, as well as various other corporate documents, to keep the documents private and locked in his safe.  *See* Stipulation regarding Ruocco's Attorney, attached as Exhibit 19.  The Defendants understood that their self-dealing would be better kept secret if the documents constituting their association in fact were kept private.

91.     Tomicic further demonstrated the Defendants' knowledge of the predicate acts they committed by faxing a memo purporting to legitimize the RecTec inflations to ATCO employee Powers on August 3, 2005 (*See* Tomicic Memo to Powers, dated August 3, 2005, attached as Exhibit 20), and later faxing ATCO employee Powers bogus competitive bids on September 8, 2005, to legitimize the invoice prices submitted to ATCO which had been funneled through McCambridge and RecTec for inflations.  *See* attached Exhibit 16.  Lastly, on July 7, 2009, McCambridge, in a plea agreement with the government, admitted that he conspired to defraud a property developer.  *See* attached Exhibit 1.

92.    The Enterprise Inflations damaged Plaintiff ATCO by at least $405,068.04 (close to $600,000.00 with pre-judgment interest as calculated at the time of filing) in its business and property.

### THIRD CAUSE OF ACTION
#### (Fraud)

93.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

94.    All Defendants have committed fraud.  Ruocco and Tomicic on behalf of ETI agreed with general contractor Plaza to submit direct cost invoices which would include compensation for ETI of "[f]ifteen [p]ercent (15%) to cover overhead, supervision, small tools and profit."  *See* attached Exhibit 14 at 4.

95.    However, for at least the Twelve Fraudulent Services, and possibly more, related to the ETI Project, ETI had the direct cost invoices routed through RecTec where RecTec inflated the direct cost invoices while providing no additional services whatsoever regarding the ETI Project.  *See* attached Exhibit 15.

96.    The Defendants' fraud in inflating invoices during at least late 2004 and 2005 while providing no additional services, damaged ATCO by at least $405,068.04 (close to $600,000.00 with pre-judgment interest as calculated at the time of filing) as ATCO had to pay for the inflated invoices and the subsequent increases in ETI's 15% Markup and Plaza's 21% Markup.

97.    Ruocco and Tomicic of ETI never notified ATCO or Plaza of the financial ties between themselves and McCambridge and RecTec.  The documents representing

these financial ties were signed privately and kept in Ruocco's attorney's safe.  *See* attached Exhibit 19.

98.    ATCO justifiably relied on the Enterprise's fraudulently created back-up documents, including the bogus competitive bids, which were generated to support the ultimate Fraudulent Invoices submitted to ATCO.  On at least the Twelve Fraudulent Services, ETI submitted misleadingly high budget prices to ATCO that allowed them to then route the direct cost invoices through RecTec in order to self-deal within the Enterprise to match the intentional direct cost overestimations.

99.    ATCO, in understanding that removing the Polluted Materials in an environmentally sustainable fashion was expensive, did not notice the Defendants' fraud until at least June 4, 2008, when an EPA investigation highlighted the possibility that Ruocco and Tomicic, through ETI, had conspired with third-parties to inflate project invoices at Atlas Park.  But ATCO did not fully comprehend all aspects of Defendants' fraud until August 17, 2009 when it had compiled enough data to generate a Victim Impact Statement related to the criminal matter brought by the United States Attorney in the District of Connecticut against McCambridge

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff demands judgment against Defendants as follows:

A.  At least, $405,068.04 in damages for the inflated invoices created by the Enterprise and the subsequent increases in percent profits caused by the fraudulent invoices;

B.  Other damages directly related to the Enterprise's misconduct, including attorney and other professional fees incurred prior to this litigation;

C.  Treble damages pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

D.  Applicable interest on the foregoing amount;

E.  Cost of suit and attorneys' fees pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c); and

F.  Such other and further relief as the Court deems just and proper.

Dated:  May 25, 2012
　　　　New York, New York

By: _____
　　　John G. Balestriere
　　　Jillian L. McNeil
　　　**BALESTRIERE FARIELLO**
　　　225 Broadway, Suite 2900
　　　New York, NY 10007
　　　Telephone: (212) 374-5401
　　　Facsimile:   (212) 208-2613
　　　*Attorneys for Plaintiff*

## Exhibits

**Exhibit 1:**   McCambridge Plea Agreement, dated July 7, 2009

**Exhibit 2:**   Press Release titled "Massachusetts Man Admits Role in Fraud Scheme," dated July 7, 2009

**Exhibit 3:**   Grand Jury Indictment, dated September 16, 2009

**Exhibit 4:**   Press Release titled "Controversial State Contractor Frank Ruocco Not Guilty in Federal Fraud Trial," dated November 4, 2011

**Exhibit 5:**   ETI II Plea Agreement, dated November 22, 2006

**Exhibit 6:**   Press Release titled "Conspiracy Case Ends in Acquittals," dated November 14, 2011

**Exhibit 7:**   Press Release titled "DOT Overrode Blumenthal, Kept Firm on Hire List," dated August 30, 2010

**Exhibit 8:**   RecTec Certificate of Organization, dated May 5, 2004

**Exhibit 9:**   SRS Wire Transfers to RecTec, dated May 26, 2004 to December 1, 2004

**Exhibit 10:**   SRS Articles of Dissolution, dated December 31, 2004

**Exhibit 11:**   RecTec Operation and Equity Agreement, dated November 24, 2004

**Exhibit 12:**   RecTec Promissory Note, dated November 24, 2004

**Exhibit 13:**   Stipulation regarding The Abrams Trust

**Exhibit 14:**   Plaza Sub-Contract with ETI, dated September 2, 2004

**Exhibit 15:**   Price List regarding RecTec Direct Cost Inflations on the Twelve Fraudulent Services

**Exhibit 16:**   Bogus Competitive Bids, dated September 8, 2005

**Exhibit 17:**   Letter from ATCO Environmental Lawyer regarding Notice of Claim, dated June 5, 2008

**Exhibit 18:**   Predicate Acts Table

**Exhibit 19:**     Stipulation regarding Ruocco's Attorney

**Exhibit 20:**     Tomicic Memo to Powers, dated August 3, 2005