UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                                                      :
THE HEMMERDINGER CORPORATION,                                         :
d/b/a ATCO,                                                           :
                                                                      : **MEMORANDUM AND ORDER**
                              Plaintiff,                               :
                                                                      :       12-cv-2650 (WFK)
              v.                                                       :
                                                                      :
FRANK M. RUOCCO, JR., BORIS A. TOMICIC,                              :
WILLIAM S. MCCAMBRIDGE, EARTH                                          :
TECHNOLOGY, INC., and RECYCLE                                          :
TECHNOLOGY, LLC,                                                       :
                                                                      :
                              Defendants.                             :
----------------------------------------------------------------------X

**WILLIAM F. KUNTZ II, United States District Judge:**

On May 25, 2012, the Hemmerdinger Corporation, d/b/a ATCO, ("Plaintiff") filed a Complaint against Frank M. Ruocco, Jr., Boris A. Tomicic, William S. McCambridge, Earth Technology, Inc., and Recycle Technology, LLC, alleging common law fraud and violation of the civil Racketeering Influenced and Corrupt Organizations Act ("RICO"). On October 7, 2013, the Court dismissed Plaintiff's common law fraud claims against Defendants Ruocco, ETI, and RecTec. Defendants Ruocco, Tomicic, and Earth Technology, Inc., (collectively, "Defendants") now move for summary judgment on all remaining claims,[1] and Plaintiff moves for partial summary judgment on seven of Defendants' affirmative defenses. For the reasons stated below, the Court DENIES Defendants' motion for summary judgment and GRANTS Plaintiff's motion for partial summary judgment.

## BACKGROUND

At its epicenter, this case focuses on a single dollar amount: $250 per ton of earth.

Plaintiff alleges the dollar amount was fraudulently inflated; Defendants allege that the amount

---

[1] Defendants McCambridge and RecTec have neither moved for summary judgment nor joined in Defendants Ruocco, Tomicic, and ETI's motions.

1

was orally agreed upon by all parties. The Court finds, however, that the exact origin of the $250-per-ton figure remains a material fact in genuine dispute requiring decision by trial scheduled to begin on April 25, 2016. *See* Order, ECF No. 191.

## I. The Shops at Atlas Park

The Shops at Atlas Park is an open-air shopping mall containing stores commonly found in shopping centers around the nation. Sana Siwolop, *Town Square from a Queens Industrial Park*, N.Y. Times, Apr. 19, 2006. Over a century ago, the parcel upon which the Shops at Atlas Park is located held a 40,000 square foot brick factory that was used as a power plant in 1903. *Id.* In 1922, Henry Hemmerdinger purchased a warehouse on the property, and by the 1950s, the warehouse had evolved into a successful industrial park, known as Atlas Terminals. *Id.*

In the early 2000s, ATCO, the Hemmerdinger-family operated company, decided to redevelop twelve acres of Atlas Terminals. *Id.* The site was heavily contaminated by industrial waste that had seeped into the soil over the past century, requiring costly redevelopment. *Id.* ultimately ATCO spent approximately $200 million in constructing The Shops at Atlas Park. Pl.'s Partial Summ. J. Mot. 56.1 Statement ¶ 39, ECF No. 192-1.

$32 million in tax credits through the New York State "Brownfield Cleanup Program," however, significantly offset the costs of environmental remediation and redevelopment of Atlas Terminals, and provided ATCO tax incentives to pursue its project. Defs.' 56.1 Statement ¶ 41, ECF No. 195-1; Pl.'s 56.1 Statement ¶ 17, ECF No. 196-1. To qualify for these brownfield tax credits, real property must be classified by New York State as a "brownfield site," land contaminated with unhealthy levels of industrial waste. *See* Pl.'s 56.1 Statement ¶ 17.

2

## II. Unexpected Contamination: Hiring of ETI and RecTec

The New York State Department of Environmental Conservation classified twelve acres of Atlas Terminals as a brownfield site. *Id.* ¶ 16–18. ATCO, now led by the grandson of Henry Hemmerdinger, oversaw the Atlas Park project and provided the startup equity for construction. Defs.' 56.1 Statement ¶ 4–5. In mid-2004, ATCO hired Plaza Construction Corporation ("Plaza") as its general contractor for the redevelopment project. Pl.'s 56.1 Statement ¶ 1. Plaza was paid through a "costs plus" arrangement—an arrangement where Plaza would be reimbursed for its direct costs and paid an additional amount equal to 21% of its actual costs. *Id.* ¶ 12. This additional 21% essentially represented profits less overhead costs, supervision, small tools, and any other operating costs. *Id.*

Plaza hired a host of subcontractors for various aspects of the Atlas Park project. The soil excavation and soil remediation work went to Earth Technology, Inc. ("ETI"), a company owned by Frank Ruocco and based in North Haven, Connecticut. *Id.* ¶ 1–3. ETI's project manager for the Atlas Park site was Boris Tomicic. Defs.' 56.1 Statement ¶ 3. ETI, like Plaza, was paid under a "costs plus" arrangement: costs plus 15%. Def.'s Mot. Summ. J. Ex. D ¶ 3.6, ECF No. 195-5 (ETI's contract with Plaza).

While renovating Atlas Park, Plaza came across unexpected contamination, which threatened to increase the cost of the project drastically and cause even more costly delay. Pl.'s 56.1 Statement ¶ 10. Plaza turned to ETI, the subcontractors hired to do soil excavation and soil remediation work, which in turn hired a soil "broker[]," Recycle Technology, LLC ("RecTec"). Defs.' 56.1 Statement ¶ 17. The parties dispute the role of RecTec, a Massachusetts limited

3

liability corporation managed by William S. McCambridge. ATCO claims that RecTec provided nothing of value, serving merely as a mechanism to defraud ATCO by fraudulently inflating costs that were ultimately paid by ATCO. Compl. ¶ 6, ECF No. 1. Defendants Ruocco, Tomicic, and ETI, however, claim that RecTec acted as a "soil broker[]" "common in the soil remediation industry." Defs.' 56.1 Statement ¶ 17.

### III. Conspiracy and RICO Alleged by Plaintiff

On June 4, 2008, ATCO's environmental lawyer, Linda Shaw, spoke with Investigator Thomas Rudman of the Environmental Protection Agency ("EPA"). Pl.'s 56.1 Statement ¶ 64. Rudman informed Shaw of the EPA's investigation into Defendants for fraud. *Id.* ¶ 65. On August 17, 2009, ATCO prepared a Victim Impact Statement in the prosecution of Defendants. Pl.'s Partial Summ. J. Mot. 56.1 Statement ¶ 42. Defendant McCambridge pled guilty to conspiracy to commit wire fraud. Pl.'s 56.1 Statement ¶ 66. Defendants Tomicic, Ruocco, and ETI were also criminally prosecuted for wire fraud. *Id.* ¶ 65. Tomicic was ultimately convicted of wire fraud; Ruocco and ETI were acquitted. *Id.* ¶ 67.

Following Defendants' criminal prosecutions, ATCO initiated this suit, alleging civil RICO and fraud in its overpayment of $405,068.04 between 2004 and 2005. *See* Compl. In short, the demanded $405,068.04 figure derived from overpayments of $291,101.72, which arises out of the $250-per-ton-of-soil figure submitted by ETI to Plaza. *Id.* at 17 (table); *id.* ¶ 49. This overpayment was then serially amplified by the cost-plus arrangement, with a 21% markup to Plaza and a 15% markup to ETI. *Id.* ¶ 54.

## IV. Summary Judgment

On September 8, 2015, Defendants submitted their motion for summary judgment. ECF No. 195 (Defendants' motion), 196 (Plaintiff's opposition), 197 (Defendants' reply). Plaintiff simultaneously filed a motion for partial summary judgment on seven of Defendants' affirmative defenses. ECF No. 192 (Plaintiff's motion), 193 (Defendants' opposition), 194 (Plaintiff's reply).

On November 3, 2015, the Court granted Defendant Tomicic's request to supplement his summary judgment motion. ECF No. 202–05, 207, 209 & 210. In response, the parties filed several supplemental briefs. ECF No. 213–215. On January 29, 2016, the Court granted Defendants Ruocco, ETI, and Tomicic permission to further supplement their papers. ECF No. 219, 223. The parties then proceeded to file several more supplemental briefs. ECF No. 224–27, 320.

## DISCUSSION

### I.    <u>Summary Judgment Standard</u>

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citations omitted).

No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (internal editing omitted) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

If the moving party satisfies this burden, the non-moving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Importantly, if the evidence produced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

For the reasons set forth below, the Court DENIES Defendants' motion for summary judgment and supplemental motions for summary judgment and GRANTS Plaintiff's motion for partial summary judgment.

## II.    Analysis

The Court analyzes two theories of the case Defendants present: a civil RICO theory and a contract theory.

A civil RICO claim must contain (1) a separate and distinct RICO enterprise that (2) engaged in a pattern of racketeering activity (3) causing harm to the Plaintiff. *See* 18 U.S.C. § 1962(c); *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 343–44 (2d Cir. 1994). Defendants argue that Plaintiff fails to establish any element of the civil RICO theory,

and repeat a statute-of-limitations argument presented before this Court on their motion to dismiss. Defs.' Mot. Summ. J. at 13–24, 32. The Court disagrees with Defendants arguments and DENIES Defendants' motion for summary judgment on this civil RICO theory.

Defendants also present a self-created contract case, claiming that Plaintiff should have brought a breach-of-contract action instead of the instant civil RICO action. *See id.* at 24–27. Defendants make several arguments against this hypothetical contract case and raise seven affirmative defenses, which are the subject of Plaintiff's motion for partial summary judgment. *Id.*; Ans., ECF No. 58; Pl.'s Mot. Summ. J., ECF No. 192. This fantasy breach-of-contract case is not before the Court. Accordingly, the Court DENIES Defendants' motion for summary judgment on these matters, and GRANTS Plaintiff's motion for partial summary judgment.

## A.   Civil RICO Theory

To establish a civil RICO claim, Plaintiff must establish (1) a separate and distinct RICO enterprise, (2) a pattern of racketeering activity, and (3) causation and harm. *See* 18 U.S.C. § 1962(c); *Riverwood*, 30 F.3d at 343–44. Defendants allege that Plaintiff fails to establish any of the three elements, and further argue that the Court should dismiss the instant action because of (4) the expiration of civil RICO's four-year statute-of-limitation period. Defs.' Mot. Summ. J. at 32.

### 1.   Separate and Distinct RICO Enterprise

A civil RICO claim arises under 18 U.S.C. § 1962(c) when a RICO "person" participates in the conduct of a RICO "enterprise" through a pattern of racketeering activity.[2] The "person" and

---

[2] Section 1962(c) reads: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in

"enterprise" in a civil RICO action must be distinct. *See Riverwoods*, 30 F.3d at 344. In other words, a RICO claim requires at least two separate and distinct entities. *See Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 161 (2001) (requiring "[t]he existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").

When analyzing a civil RICO claim, the Court "begin[s] from an understanding of what enterprise is alleged." *Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 74 (E.D.N.Y. 2011) (Hurley, J.) (quoting *Spira v. Nick*, 876 F. Supp. 553, 561 (S.D.N.Y. 1995) (Kaplan, J.)). There are two types of RICO enterprises: "'legal entities' such as corporations and partnerships, and 'any union or group of individuals associated in fact although not a legal entity.'" *Gross v. Waywell*, 628 F. Supp. 2d 475, 497 (S.D.N.Y. 2009) (Marrero, J.) (quoting 18 U.S.C. § 1961(4)). The latter enterprise, known as an "association-in-fact" enterprise, applies here, where the RICO enterprise is comprised of the five RICO persons: three "Individual Defendants" (Tomicic, Ruocco, and McCambridge) and two "Legal-Entity Defendants" (ETI and RecTec).

"[A]n enterprise must function separate and distinct from the person who allegedly conducts the racketeering activity of that enterprise." *Crabhouse*, 801 F. Supp. 2d at 77. Because a corporation can act only through its employees, suing a corporation is, in all cases, suing an enterprise. To permit a corporation that consists of the corporate entity and its employees to serve as

---

the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

both the RICO person and RICO enterprise would result in RICO liability for all corporate activities falling within the reach of RICO. *See id.* at 82.

Defendants argue that no distinct RICO enterprise existed because the RICO persons were the same as the RICO enterprise.[3] Defs.' Mot. Summ. J. at 14 (quoting *Crabhouse*, 801 F. Supp. 2d at 77, for support). This argument requires Defendants to show an identity between the two Legal-Entity Defendants and the three Individual Defendants. *See Crabhouse*, 801 F. Supp. 2d at 77–79.

Here, the three Individual Defendants were not cogs in the corporate machine of the two Legal-Entity Defendants. The Individual Defendants were separate and distinct entities, with their separate and distinct roles in the alleged fraud well established in their criminal prosecutions. The Corporate Defendants are also separate and distinct entities. According to Defendant Ruocco, RecTec and ETI were a "complementary business[es]." Defs.' Mot. Summ J., Ex. K at 34; *id.* at 8 (characterizing RecTec as "a legitimate business venture" with its own "anticipated clientele"); *id.* at 28 ("McCambridge demonstrated his autonomy in RecTecc [*sic*] by filing bankruptcy on its behalf over Ruocco's and everyone's objection"). Indeed, RecTec and ETI not only operated with parties other than Plaintiff, but they operated with parties different from one another. *See id.*, Ex. K at 34 (regretting that RecTec was not used in "nearly as many [ETI projects] as [Defendant Ruocco] wanted"). Accordingly, the five RICO persons were separate and distinct legal entities in form and in substance. Defendants' arguments to the contrary are unavailing. *See id.* at 28–29.

---

[3] The argument presented is quite ambiguous. Defendants' argument could be interpreted in at least three ways: (1) the Individual Defendants are identical to the Legal-Entity Defendants, (2) the Legal-Entity Defendants are identical to the Individual Defendants, or (3) the Legal-Entity Defendants are actually a single entity that is identical to the Individual Defendants. Under interpretation (1), the Legal-Entity Defendants should be dismissed. Under interpretation (2), the Individual Defendants should be dismissed. Under interpretation (3), all defendants should be dismissed. None is supported by the record.

## 2.    Pattern of Racketeering Activity

The second element for a civil RICO action is a pattern of racketeering activity. A pattern of racketeering activity requires "at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). An act of racketeering "must be among the various criminal offenses list[ed] in § 1961(1), and they must be 'related, and [either] amount to or pose a threat of continuing criminal activity.'" *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). In short, a "pattern of racketeering activity" must consist of (1) multiple racketeering activities (2) that threaten continuing criminal activity. Defendants first argue that only a single discrete fraud occurred. Defs.' Mot. Summ. J. at 15. Defendants then argue that Plaintiffs have failed to establish the threat of continued criminal activity. *Id.* For the reasons stated below, the Court rejects Defendants arguments.

### a.    At Least Two Acts of Racketeering

Plaintiff establishes at least two acts of racketeering activity by listing ninety allegations of mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. *See* Compl., Ex. 18 (Predicate Acts Table). Defendants do not deny the numerous allegations against them. *See* Defs.' Mot. Summ. J. Instead, Defendants argue that civil RICO allegations based solely on mail fraud, wire fraud, and conspiracy to do the same should be collapsed into a single act of mail or wire fraud. *Id.* at 15–16. Defendants, however, fail to point to any record evidence in support of this contention, and this Court's Motion-to-Dismiss Decision stands firm: "[T]here is evidence that mail fraud was

part of a consistent series of acts done in furtherance of the main criminal objectives of the conspiracy to defraud [Plaintiff]." Decision & Order at 22, ECF No. 51.

Defendants' citation to *Gross*, 628 F. Supp. 2d 475, does not require a contrary finding. *See* Defs.' Mot. Summ. J. at 15–16. The *Gross* court stated that "RICO claims premised on mail or wire fraud must be particularly scrutinized" because they "are 'unique' among the various RICO predicate acts. Unlike the other criminal offenses the statute enumerates as racketeering, use of the mail or wires is not inherently criminal." *Gross*, 628 F. Supp. 2d at 493. (internal citation omitted). Furthermore, because of the near ubiquitous use of mail or wire communication, RICO claims based on mail or wire fraud may inappropriately "federalize garden-variety state common law claims." *Id.* at 482, 493.

Civil RICO deputizes civil litigants as "private attorney general[s]" to further the "preventive and remedial" purposes of the statute. *Id.* at 481 (quoting *United States v. Turkette*, 452 U.S. 576, 593 (1981), and *Agency Holdg. Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143 (1987)). The Court acts as a gatekeeper in these civil RICO cases to ensure that the alleged offenses are "of a degree sufficiently serious not only to inflict injury upon its immediate private victims, but also to cause harm to significant public processes or institutions, or otherwise pose threats to larger societal interests worthy of the severe punitive and deterrent purposes embodied in the statute." *Id.* The alleged offenses here are sufficiently serious. Plaintiff alleges unlawful activity that has been the basis for multiple criminal prosecutions in federal court, which evidences a significant risk of repetition and exemplifies civil RICO's "preventive" purpose. *See, e.g.*, Defs.' Mot. Summ. J., Ex. X (grand jury indictment of Ruocco, McCambridge, Tomicic, and ETI), Ex. G (McCambridge's

11

guilty plea), & Ex. H (Tomicic's criminal judgment). Furthermore, the alleged racketeering activity caused public harm because Defendant allegedly absconded with public funds in the form of the brownfield tax credits. Finally, a federal forum is appropriate because the alleged unlawful conduct took place in multiple states. In light of these additional considerations, the Court finds that the record supports a finding of multiple racketeering acts.

### b. Continuity

Defendants argue that Plaintiffs have not established continuity sufficient to establish a "pattern" of racketeering. *Id.* at 15; *see also* Decision & Order at 19–22 (addressing the same argument in Defendants' motion to dismiss). The Court's earlier findings stand because Defendants have provided nothing more than a citation to *Spool*, 520 F.3d 178, a decision fully addressed in the Court's Motion to Dismiss Decision and Order. *Id.* at 15; *see* Decision & Order at 22 (explaining that Plaintiff alleged racketeering activity, spanning a period just shy of three years, adequately pleads close-ended continuity). Accordingly, Plaintiff presents sufficient continuity on the record to survive summary judgment.

### 3. Harm and Causation

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool*, 520 F.3d at 183 (internal citations and quotation marks omitted). Plaintiff has established a violation of the RICO statute. *Supra*. Defendants now argue that they caused no injury to Plaintiff. *See* Defs.' Mot. Summ. J. at 20–24.

Defendants first argue that Plaintiff suffered no legally cognizable injury. According to Defendants, Plaintiff's injury is "uncertain," because Mr. Hemmerdinger stated at his deposition that he was "not sure" of the damages caused by Defendants. *Id.* at 22. The record does not support this claim. Instead, the record shows that Mr. Hemmerdinger was merely uncertain of the actual figure recovered from Plaintiff's insurance company. This does not prove speculative harm. Indeed, Plaintiff has provided a spreadsheet calculating its losses down to the penny.[4] Compl. Ex. 18 (showing a charge of $3,530.37 on November 17, 2006). To the extent Defendants disagree with the actual extent of Plaintiff's injury, that question is one for the jury, not summary judgment.

Defendants also argue that the criminal acquittal of Defendants ETI and Ruocco cures Plaintiff of injury. Def.'s Mot. Summ. J. at 21. The acquittal of Defendants ETI and Ruocco in their criminal prosecutions, however, does not require the Court to dismiss this civil case.[5] Criminal proceedings are punitive in nature, whereas civil proceedings are remedial in nature. *See United States v. Carson*, 52 F.3d 1173, 1183 (2d Cir. 1995) (finding that civil RICO following the wake of a criminal proceeding did not violate Double Jeopardy). Accordingly, Plaintiff may pursue a civil RICO claim even after Defendants' criminal acquittals. *Id.*

---

[4] For this reason, Defendants' citation to *DLJ Mortgage Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) (Vitaliano, J.), does not require dismissal of this case. Plaintiff has presented damages that satisfy civil RICO's "more rigorous" standing requirements. *Id.*; *see also DeSilva v. North Shore-Long Island Jewish Health System, Inc.*, 770 F. Supp. 2d 497, 521 (E.D.N.Y. 2011) (Bianco, J.) (dismissing a civil RICO claim because injury was contingent upon the outcome of a pending case).

[5] Defendants claim that statements made by Mr. Hemmerdinger during a deposition identified only two defendants: Tomicic and McCambridge. Defendants then proceed to argue that these statements should bind this Court, requiring the dismissal of Ruocco and ETI. Defs.' Mot. Summ. J. at 30. Defendants' mischaracterize Mr. Hemmerdinger's statements.

Defendants further argue that they were not the cause of Plaintiff's injury. While a civil RICO plaintiff must satisfy a "more stringent showing of proximate cause than would be required at common law," *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 285 n.5 (2d Cir. 2006), the causal chain here is sufficiently clear to link Defendants' wrongdoings with Plaintiff's injury.

The Second Circuit uses a two-part test for proximate cause in civil RICO. *Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003). "First, the plaintiff's injury must have been 'proximately caused by a pattern of racketeering activity violating [18 U.S.C. §] 1962 or by individual RICO predicate acts.'" *Id.* (quoting *Lerner*, 318 F.3d at 122–23). Here, Plaintiff's overpayment directly stemmed from Defendants' fraudulently inflated invoices. "Second, the plaintiff must have suffered a direct injury that was foreseeable[.]" *Id.* Here, Defendants' entire RICO scheme was designed to collect unearned money from Plaintiff. Having satisfied both prongs, Plaintiff has established proximate causation.[6]

Defendants attempt to break the causal chain through various arguments, which the Court finds without merit. First, Defendants argue that Plaintiff did not rely on Defendant Tomicic's convicted fraudulent act. *See* Defs.' Mot. Summ. J. at 18–19. But Plaintiff did rely. Even assuming that Plaintiff selected ETI without bidding, Defendant Tomicic created "fraudulent 'back-up documentation'" to cover up Defendants' fraud, and Plaintiff relied upon these fraudulent invoices when making payments. *See id.* As such, Defendants' non-reliance argument fails. *See id.* at 27. Second, Defendants claim that Plaintiff's alleged negligence served as an intervening cause that

---

[6] Defendants' zone-of-interest argument, Defs.' Mot. Summ. J. at 20–21, is incorporated by in the Court's proximate-cause analysis. *See Baisch v. Gallina*, 346 F.3d 366, 372–73 (2d Cir. 2003) (discussing the interaction between proximate cause and zone of interest).

severs their fraud from Plaintiff's injury. *See id.* at 23–24. Defendants essentially argue that Plaintiff, a victim and target of Defendant's fraudulent actions, is negligent for not discovering the fraud when, in hindsight, it could have. This argument is without merit.

### 4.    Statute of Limitations

Defendants provide no new evidence requiring the Court to reconsider its earlier denial of Defendants' motion to dismiss on statute-of-limitations grounds. *See id.* at 32; Decision & Order. Without supplying new evidence warranting a contrary decision, the Court again finds that Plaintiff has sufficiently established the elements of a civil RICO violation. *See United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("[W]hen a court reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court . . . that decision should generally be adhered to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons militate otherwise." (internal citations and quotation marks omitted)); *Firestone v. Berrios*, 42 F. Supp. 3d 403, 411 (E.D.N.Y. 2013) (Spatt, J.) ("According to the doctrine of 'law of the case,' a decision regarding an issue of law made at one stage of a litigation becomes binding precedent, to be followed in subsequent stages of the same litigation." (internal citations and quotation marks omitted)).

* * *

For the reasons stated above, the record supports Plaintiff's civil RICO claims.

## B. Contractual Theory

Many of Defendants' arguments assume a breach-of-contract action, but that action is not before the Court.[7] *See, e.g.*, Defs.' Mot. Summ. J. at 31 ("Plaintiffs cannot masquerade a breach of contract claim as a fraud claim."); *id.* at 7 ("Plaintiff itself admits that the facts though brought here as a fraud/R.I.C.O. case are in fact a breach of contract."). The civil RICO statute uses broad language for broad reach. RICO "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-617, at 76 (1969). A civil suit may be brought by "any person injured in his business or property" by a violation of civil RICO. 18 U.S.C. § 1964. This case falls within civil RICO for the reasons discussed earlier. Arguments sounding in contract are inapposite, and the Court, therefore, DENIES Defendants' motion for summary judgment based upon a contract theory of the case.

### 1. Role of the $250 per Ton Figure

The crux of the disagreement in this case is the figure of $250 per ton of soil. Plaintiff alleges that the figure is the result of an elaborate scheme to defraud Plaintiff and generate unlawful profit for Defendants. Defendants argue that the figure is the result of an agreement between the parties. The Court finds that the origin of the dollar figure remains a material fact in genuine dispute.

---

[7] Contrary to Defendants' allegations, this Court maintains diversity jurisdiction even absent the civil RICO claims. 28 U.S.C. § 1332; *see* Defs.' Mot. Summ. J. at 21–22 ("When RICO is the only basis for federal jurisdiction, these state law claims must be pursued in state court . . . .").

Plaintiff claims that the $250 figure was the result of fraud. Plaintiff's theory of conspiracy begins with ETI, a company owned by Ruocco with Tomicic as the project manager for the Atlas Park project. Compl. ¶ 3. ETI would route its direct-cost invoices—invoices reflecting the actual cost of ETI's business—to RecTec. *Id.* ¶ 7. Then RecTec, a company with Ruocco, Tomicic, and McCambridge as its sole equity holders, would inflate ETI's invoices while providing no services to Plaintiff. *Id.* ¶¶ 43, 47. ETI "paid" RecTec for its "services," and proceeded to submit these inflated invoices to Plaza. *Id.* ¶ 53. Plaza then paid ETI's inflated invoices, along with ETI's 15% markup, and submitted its own bill to Plaintiff. *Id.* ¶ 54. Plaintiff paid Plaza for its costs plus a 21% markup. This scheme allegedly resulted in a fraudulent overpayment of $405,068.04. *Id.*

Defendants argue that the $250-per-ton figure was not unlawful because it came from agreement or acquiescence. *See, e.g.*, Defs.' Mot. Summ. J. at 7 ("Damon Hemmerdinger and his 'team' participated in setting the price of $250 per ton for the disposal of the lead hazardous soil[.]"). The existence of an agreement alone, however, does not preclude a finding of fraud.[8] The Court finds that Plaintiff reasonably rely upon the representations of Defendants and assume those representations were legally derived. *See, e.g.*, Defs.' Mot. Summ. J. Ex. G at 100, 109–57 (Trial Transcript of Damon Hemmerdinger in U.S. v. Ruocco, 09-cr-210) (assuming the $250-per-ton figure was derived legally). Indeed, fraud requires Plaintiff to agree or acquiesce. *See* FRAUD, Black's Law Dictionary (10th ed. 2014).

---

[8] For this reason, Defendants' argument for estoppel by participation and ratification does not call for summary judgment. Defs.' Mot. Summ. J. at 30.

While the line between fraud and a bad business deal may at times be a blurry one, in this case, the question is a matter is for the jury to decide. Defendants present various arguments that evidence a bad business deal by Plaintiff, instead of fraud by Defendants. None justifies summary judgment.

### a. Active Participation in Deriving the $250-per-ton Figure

Defendants' evidence supporting an agreement of $250 per ton between the parties is not dispositive of the issue. A significant portion of the record that Defendants point to for support in their motion for summary judgment consists of self-serving testimony. *See, e.g.*, Defs.' Mot. Summ. J. at 8 ("Mr. Tomicic testified [that] Damon Hemmerdinger directed him to proceed with the transportation and disposal of the lead hazardous soil at $250 per ton."). To the extent Defendants point to statements made by Plaintiff or its representatives, these statements are, at best, much weaker than counsel suggests and, at worst, misleading when viewed in context.[9] The record outside of self-serving statements made by Defendants do not disprove a cost-plus arrangement. *See, e.g.*, *id.* Ex. I at 27, 32 (Dep. Mark J. Powers, Representative of Plaintiff) (not recalling whether Damon Hemmerdinger agreed to the $250 per ton figure); Ex. D ¶ 3.6 (Plaza-ETI Contract) (explicitly providing for a cost-plus payment scheme); Ex. G at 96:11–12 (Trial

---

[9] For example, Defendants point to allegedly inconsistent statements made by Plaintiff's representative, Damon Hemmerdinger. Defs.' Mot. Summ. J. at 13 n.42. Defendants argue that Mr. Hemmerdinger first testified at Defendant Ruocco's criminal trial that the $250-per-ton figure came from Mr. Tomicic, but then flipped positions at a deposition for this case by saying the figure did not come from Mr. Tomicic. *Id.* at 13. Upon review of the record, however, the positions are not inconsistent. Mr. Hemmerdinger's statement at trial was that Tomicic "told [him] that the price should be $250 at [*sic*] ton." *Id.* Ex. G at 101. Mr. Hemmerdinger's statement at deposition was that the "budget price" submitted to him "was stated verbally at a meeting that included [Mr. Hemmerdinger], Boris [Tomicic], Mark Powers, Linda Shaw, and representatives from Langan Engineering and Plaza Construction." *Id.* Ex. H at 80. These statements are not necessarily inconsistent.

Transcript of Damon Hemmerdinger in *U.S. v. Ruocco*, 09-cr-210) (stating that cost plus a fair markup was "always" used).

### b. Fair and Reasonable Price

To further corroborate their bad-business-deal theory, Defendants argue that the $250-per-ton figure was fair and reasonable. *Id.* at 26. To support the fair-and-reasonable price of $250 per ton, Defendants point to two pieces of evidence: Plaintiff's acquiescence to the amount and a $235-per-ton quote from Plaintiff's insurer, Chubb & Sons. *Id.* at 9.

A fair and reasonable price, however, does not preclude a finding of fraud. Many a successful fraud masquerades as fair and reasonable; the better to defraud the victim in the first place. A jury could just as easily find a fair-and-reasonable fraud as a fair-and-reasonable bad business deal.

### c. Representation to Others and Foul Play

Defendants carry their contract argument a step further by arguing that Plaintiff purposefully agreed to the inflated $250-per-ton figure in order to commit insurance and tax fraud. *See id.* at 7 ("Plaintiff actively participated and benefited from the $250 per ton, by at least, utilizing the $250 per ton to obtain a higher settlement amount from Chubb Ins. Co. . . . [and] to obtain a higher Brownfield tax credit[.]"); *id.* at 10 ("ATCO represented to Chubbs Ins., that ATCO itself had retained the services of Recycle Technology LLC, in order to obtain a successful outcome in the settlement negotiations."); *id.* at 20 ("Plaintiff's own fraud, negligence, lack of oversight/verification, participation, are not within the realm of the zone-of-interests for which R.I.C.O. was designed to protect."); *id.* at 27 (alleging insurance fraud). Not

only does this theory lack support on the record (outside of Defendants' self-serving statements) but this theory would necessarily admit that Defendants' $250-per-ton figure was fraudulently inflated.[10] If Plaintiff defrauded its insurance company by submitting Defendants' $250-per-ton fee, then Defendants' fee must have been fraudulent in the first instance. Moreover, the Atlas Park project was classified as a brownfield site before the events resulting in this case. Furthermore, as explained by Plaintiff, the alleged insurance fraud would have resulted in a loss of $405,068.04. Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Opp. Mem.") at 2, ECF No. 196. To the Court's knowledge, the only incentive for Plaintiff to attempt to defraud New York State would be the *de minimis* increase in its tax credit. *Id.* at 3. Using Plaintiff's alleged damages of $405,068.04 and the Atlas Park project's total cost of approximately $200 million, Defendants' alleged fraud amounted to around 0.2% of the project's cost. Perhaps, as Defendants claim, Plaintiff makes very bad business deals. Perhaps not.

Defendants also attempt to tie Plaintiff to the $250-per-ton figure through representations Plaintiff made to its insurer, Chubb & Son, and to New York state courts in criminal and Article 78 proceedings. The record shows that Plaintiff used the $250-per-ton figure in its representations to Chubb & Son for an insurance recovery of $362.327.09. Defendants argue that this representation should bind Plaintiff and somehow eradicates the alleged fraud. The

---

[10] Defendants never claim that the $250-per-ton figure represented the true cost of its soil excavation and soil remediation project at Atlas Park. The record, viewed in the light most favorable to Defendants, reflects that RecTec may have provided some service to ETI. See Defs.' Mot. Summ. J. Ex. K at 52, 56–60 (Dep. Frank M. Ruocco, Jr.) (describing RecTec as a "broker" engaged in "waste classification," "arranging transportation," and "paying disposal facilities"); *id.* at 8 (alleging RecTec services of "[m]arket and feasibility studies"); *id.* at 7 (claiming, without support from the record, that "Plaintiff has been well-aware for years now that it is Defendants' position that brokering services by RecTec were included in ETI's bills").

record, however, shows that Plaintiff's representations were made before Plaintiff discovered the fraud alleged in this case. *Id.* at 2. As to statements made during Defendants' criminal proceedings, the Court finds that the statements identified as inconsistent are not in fact inconsistent. And, turning to the representations made by Plaintiff during the Article 78 proceedings, these representations do not pose a problem requiring a grant of summary judgment against Plaintiff. Defendants' most persuasive argument, for example, is that Plaintiff represented to the Queens County Supreme Court in Article 78 proceedings that the total remediation costs submitted were "accurate, valid and complete." Defs.' Supp. Mem. at 7–8, ECF No. 213 (citing three Article 78 petitions). These presentations included the alleged overcharged payment of $405,068.04 at issue here. This overcharge payment, however, is a mere rounding error (approximately 2.2%) when viewed in light of the massive $18 million spent on the remediation project. Therefore, Plaintiff's representations in these Article 78 proceedings and its statements here are not necessarily inconsistent. *See* Decl. Wesley Mead Ex. ¶¶ 38, 42, 54, and 136.

For similar reasons, Defendants' arguments for judicial estoppel are inapplicable.[11] *See* Defs.' Mot. Summ. J. at 29–30 (arguing for judicial estoppel and estoppel by participation).

---

[11] Defendants' argument for preclusion given the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, 3664, is without merit. *See* Def.'s Mot. Summ. J. at 19 ("invoking res judicata/collateral estoppel"). The cases cited in Defendants' motion, as well as the statute itself, deal with criminal restitution during sentencing. *See United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004) (finding that the Government falls within the term "victim" under the Mandatory Victim Restitution Act); *United States v. Johnson*, 378 F.3d 230, 244–45 (2d Cir. 2004) (addressing a criminal victim declining restitution).

### d.    Damages and Setoffs

Defendants seek a reduction in the damages claimed by Plaintiff. Defendants' contract theory of the case already attempts to eliminate treble damages under civil RICO, but this is a civil RICO case and treble damages apply. Similarly, Defendants' collateral source arguments, while proper in contract cases, are inapplicable here. *See id.* at 9, 28. To find otherwise would lead to an absurd result where civil RICO defendants may escape liability so long as third parties mitigate a victim's injury. In such a world, the insurance industry would effectively repeal civil RICO.

### e.    Duties

#### 1.    Duty to Disclose

Defendants put great stock in Plaintiff's argument that Defendants Ruocco, Tomicic, and McCambridge failed to disclose their joint ownership interest in RecTec. Defendants claim that even if Plaintiff had known of Defendants' joint ownership interest, Plaintiff would have acted no differently and, thus, Defendants' failure to disclose caused no injury. *Id.* at 25. Defendants also claim that there was no duty to disclose ETI and RecTec's joint ownership, because the contract provided no disclosure provision and, even if it did, no privity exists between Plaintiff and Defendants. *Id.* at 8–9, 12.

Defendants provide the example of Peter Ruttura as an illustration of the nonexistent duty to disclose their joint ownership. *Id.* at 12, 26–27. Ruttura had ownership interests in both Ruttura & Sons Construction and O.U.R. Rental Corp., a subcontractor and a vendor for the Atlas Park project. *Id.* at 26. Like Defendants, Ruttura was arrested for fraud, but was permitted to continue work for the Atlas Park project. *Id.* at 26–27.

22

Defendants' failure to disclose joint ownership of RecTec, however, is not the conspiracy by itself, but rather evidences the conspiracy to defraud Plaintiff. Plaintiff's theory of the case is that Defendants Ruocco, Tomicic, and McCambridge clandestinely incorporated RecTec as a vehicle to commit fraud. With this understanding, the failure to disclose ownership interest is only part of the alleged conspiracy, not the conspiracy in and of itself. Thus, the fact that knowledge of Defendants joint ownership would not have been outcome determinative does not require the Court to enter summary judgment against Plaintiff.

### 2. Plaintiff's Duties

Defendants make a number of arguments related to Plaintiff's failure to meet its duties, even while alleging that Defendants had no duties. These alleged duties include the duty to inquire and duty to inspect. *See id.* at 25 (insisting on Plaintiff's duty to inquire and inspect financial and ownership interests).

Related to the Defendants' argument that they had no duty to self report their joint ownership of ETI and RecTec, Defendants claim that such a duty to report may have arisen if Plaintiff had simply asked. *See id.* at 9 ("Defendants had absolutely no legal obligation or duty to disclose their financial or ownership interests to the Plaintiff, *absent a request*." (emphasis added)); *id.* at 12. But Plaintiff had no duty to inquire into the ownership of ETI and RecTec, just as Defendants had no obligation to disclose joint ownership.

Similarly, Defendants make multiple claims that Plaintiff breached its duty to inspect. The argument appears to be that no fraud would have occurred had Plaintiff simply inspected all the records already in its possession. *See, e.g., id.* at 11 ("Instead of verifying the bills itself, Plaintiff

23

continued to rely on Plaza, whom Mr. Hemmerdinger deemed Plaza's project manager negligent.");
*see also id.* at 12, 19. In fact, Defendants appear to take the argument one step further: Plaintiff's
failure to inspect amounted to negligence that should preclude it from recovery. *Id.* at 11 ("Plaintiff
admits to its lack of verification, and Hemmerdinger also agrees that by requesting documentation
and information, the contractor or owner could have delayed payment for any of ETI's invoices.").
This argument is absurd. Defendants essentially asks this court to place a duty upon all victims of
fraud to discover that fraud. *See, e.g., id.* at 23 ("[I]f Plaintiff was damaged at all, its damages are a
direct consequence, as an intervening cause, of its own omissions, negligent conduct."). The law
does not require such a duty.

### III.     Seven of Defendants' Affirmative Defenses Are Inapplicable Here.

For the reasons discussed above, Defendants' affirmative defenses—(1) collateral source
payment, (2) contributory negligence, (3) statute of limitations, (4) failure to plead fraud with the
requisite particularity, (5) unclean hands, (6) failure to state a claim for which relief may be
granted, and (7) failure to mitigate—are inapposite. Accordingly, the Court GRANTS Plaintiff's
motion for partial summary judgment.

24

## CONCLUSION

Defendants' motion for summary judgment is DENIED, and Plaintiff's motion for partial summary judgment is GRANTED. The parties are instructed to revise their proposed pretrial order, ECF Nos. 229, 234, and any other pretrial submissions as is necessary.

**<u>SO ORDERED.</u>**

Dated: April 19, 2016
       Brooklyn, New York

s/ WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge